Good morning. May it please the Court, Mack Lacey, on behalf of the Plaintiff's Appellants, Oregon Natural Desert Association, and Western Watersheds Project. This appeal asks the Court to consider what the proper remedy is when a legally required permit and the NEPA analysis supporting it have been vacated. It's clear under the language of the Administrative Procedure Act and the law of vacature that the permitted activity, in this case livestock grazing, cannot proceed until there has been a proper NEPA review, which in this case should have been an EIS. Now, I stand before this Court for the second time in 24 months following a district court bench decision issued orally, which was once again unclear and contained fundamental legal and factual errors. As you know, Louse Canyon is at the heart of one of just two remaining habitats that are essential, that are core to the survival and the recovery of the greater sage-grouse. And following last summer's fires, which wiped out almost a quarter of this planting area, relief from livestock grazing until a proper environmental review has occurred is more necessary than ever. Irreparable harm is likely. Now, the appropriate remedy here is that grazing should not occur this year, in 2013, unless and until a proper NEPA review has occurred, because the agency, ONDA, won summary judgment on a single claim for relief under the National Environmental Policy Act. The district judge correctly granted summary judgment in ONDA's favor, set aside the challenge decisions, which include the permits which are legally required for the livestock to be used. Now, you say the decision set aside included the permits, right? That's correct. Now, does it say so in the decision summary words that the permits are included? Yes. How do you get to that conclusion that the decision included the permits? Well, that's one of the questions that was before this Court in the prior appeal and this one. What do the decisions decide? And these are, on their face, decisions to issue 10-year permits to graze livestock on the public lands. Well, just a minute. Are you saying that in the prior appeal, there's some statement or decision that that action included the permits? The prior appeal, as you know, is a memorandum decision, so it's not going to a great deal of factual detail. Right again. The government concedes in this case that the permits were indeed set aside with the vacature order, because the 2000, the March. Is that right? I didn't pick that up. The government concedes that? That's correct. So in other words, the government proceeds that there are no grazing permits in existence now for that area. Is that right? Well, that's not the government's position. The government obviously argues that prior permits are resurrected or spring back to life, but does concede that the 2010 to 2020 permits, which are the current grazing permits, were indeed set aside with the district judges? Wait a minute. Are you speaking of the 2010 permits? Were those permits issued in 2010? That's correct, Your Honor. That's one of the. And where are those permits? Those permits were submitted with my declaration in support of Onda's urgent motion filed a few weeks ago, and the reason is because they only came to light at that time in the midst of the briefing. Those permits were issued to execute. That was part of your motion for injunction pending appeal? That's correct, because the Bureau of Land Management never actually lodged those permits in the administrative record in this case. And we only found out a few weeks ago that those permits existed, even though those were indeed the pieces of paper that executed the challenge decisions. Mr. Lacy, you mentioned. Is there something one more question. Is there something that shows or is it automatic that the 2010 permits supersede the 2006 permits? Is that right? That's correct. At FER2. How does that work? Is that part of the, you know, does that automatically happen as part of the process? When a new permit comes out, the old one's gone? Yes. At FER2 and FER9, Your Honor, BLM itself explains that the new permits, the 2010 permits, quote, replaced and, quote, superseded the prior permits. All right. Thank you. Now, I think you may have answered my question. Your position is that the language of the 2010 permits itself nullified the 2006 permits. Is that correct? Well, the terms I just used, replaced and superseded, are not in the 2010 permits. They are in, one, a letter to the public explaining new decisions that the Bureau was going to make, and then, secondly, in the proposed, a proposed decision. So it is the BLM's own description of the actual effect of these new permits. But the permit documents themselves are just the typical grazing permit, that grazing is authorized for 10 years under these terms and conditions. And your position is that the terms replace and supersede. That's correct. When those permits themselves are vacated. That's correct. It means that the 2006 permits cannot spring to life again. Correct, Your Honor. Do you have any authority from that position? Yes, Your Honor. It's an unusual situation, I grant you. However, what makes, and I will give you authority, what makes the situation here with a livestock grazing permit different from the cases we've cited in the briefs is that a livestock grazing permit is a site, a permit for a site-specific fixed-term activity. The best cases I can cite to you to support this position are actually this Court's remand-without-vacature cases. So Californian communities, Idaho Farm Bureau, Western Oil and Gas. And in those cases where the, where courts have remanded an unlawful agency action but not vacated, left something in place, what's been left in place is a prior rulemaking. So those are situations where a prior regulation has sprung back to life or been resurrected. And that only happens under very narrowly described circumstances. This Court in those cases described those as rare circumstances, as unusual circumstances. And the key factor in each of those cases was that some important environmental protection was left in place. But what was in the 2002 strategy for grazing left in place for the 2006 cases? The 2002 grazing strategy is nothing more than a table in an ecological document. So it's not an independent legal. It's an ad hominem attack on the 2002 strategy. Please answer my question. Was not the 2002 strategy kept in effect by the 2006 permits? Yes. The 2002 strategy is a modification of the 2006 permits and also the 2010 permits for that matter. It's something that the agency came up with. So as a result of the vacating of the 2010 decision, is it your position that there is no regulation whatsoever as to grazing extent in the Laos Canyon? That is correct, Your Honor. Okay. And the reason, another important reason, is that in finding that the Bureau of Land Management violated NEPA in holding unlawful and setting aside the decision, what the district court's vacature order also did was hold unlawful and set aside the environmental assessment, the 2005 environmental assessments, because it's a NEPA case and that's the environmental document that the Bureau used to justify its permitting decisions. And importantly, that same 2005 environmental assessment is the document that supported the 2006 permits as well. So it makes no sense that the 2006 permits could spring back to life based on an unlawful NEPA review. And on the other side, the last permits in the record before this Court that were adopted pursuant to a non-arbitrary, i.e., non-unlawful NEPA review were actually the 2000 permits, and those expired in the year 2009. So, Judge Baird, there are no extent grazing permits authorizing grazing now. And BLM has to do a NEPA review before releasing cows in the public land. It's no different, grazing is no different from any other authorized activity on the public lands, and the agency has to do an environmental review before allowing trees to be cut, allowing landscapes to be grazed, allowing effluent to be discharged into a river. It's like any other ground-disturbing, site-specific, fixed-term activity. Applying any test for vacatur, whether it's the important environmental concerns test that is described in the Californian communities in other cases, or whether, for example, it's the D.C. Circuits test out of the Allied Signal case, which was cited but not adopted in the Californian communities case, BLM has not established in this case that continuing grazing is somehow protective of the environment. It couldn't be based on this record. It hasn't established that the grazing decision's deficiencies are not serious. In fact, the agency didn't even defend on the merits of Vonda's NEPA claim. BLM acknowledged that, yes, we need to do more work because the 2005 environmental analysis is outdated and stale. And, yes, this important new information came out in 2009 and 2010. There's a dispute over the level of NEPA review that needs to happen, of course. But, again, under the record here, under the complete administrative or the complete record that was lodged before the district court and the complete record that's before this court, it's clear that this grazing in this area will have a significant impact on the environment. Therefore, this court should order an EIS. And, third, under vacatur, there's no argument from BLM that there would be any disruptive consequences of having to pause grazing while the agency goes back and does the proper level of review under NEPA. This makes sense for a couple reasons. First and foremost, NEPA itself, the purpose of the statute, of course, is to ensure up-front environmental analysis before action is taken. And the CEQ regulations describe the EIS requirement as NEPA's core requirement. Significant effects on the environment equals serious deficiencies. Well, this is an exactly new action, though. I mean, it's not like the cows haven't been there before. That's correct, Your Honor. Although the record shows that the sage-grouse, its populations, its habitat, its key seasonal habitats have been declining and being damaged by grazing since at least the year 2000-2001. The district court didn't conclude that or didn't find that. Indeed, the district court seemed driven by the conclusion that, at least in the near term, there didn't seem to be any detrimental effects. And I think there are conflicting statements. The district judge said that at other places in the oral ruling. The district judge also conceded that, for our purposes here, ONDA has shown that grazing damages sage-grouse habitat. Now, the district court wanted to try to put a number on it, how many cows cause how much grazing. But that's under the injunction test, which is, as we pointed out in our briefs, that's flipping the burden back to ONDA when the default should have been that BLM, as the proponent for equitable relief, should have had the burden of showing that continuing grazing would somehow be protective of the environment. So I think there's a problem with the district court. It did fine, he said. So it's undeniable, I think, uncontroverted, that the population now is a fraction of what it was in, say, the 50s and 60s. But I have to look at what has happened in the sage-grouse population in the relevant area during the period of time of the interim grazing plan. And the evidence I have in front of me certainly strongly supports the proposition that there has been no material decline in the sage-grouse population in any relevant area during the period of the relevant grazing period. Now, that's a pretty strong finding of fact, isn't it? Don't we owe that deference? Two responses to that, Your Honor. One, with respect, that that's clear error because the record does not show that there has been no material decline to the sage-grouse during any relevant period, whether it's spanning back over decades or just over the past decade or so. The record clearly shows that the sage-grouse has declined, and indeed this population is part of one that's been declining at twice the rate, the range-wide rate. And Dr. Dobkin, in his declaration, said that this grazing at these times and places will, without a doubt, cause harm to the sage-grouse. And it's important to point out that Dr. Dobkin's expert declaration is uncontested. BLM never submitted a declaration from a sage-grouse expert of its own to dispute any of Dr. Dobkin's conclusions. And then to come back to this ---- Your position is that under our clear error test, which under Hinkson says it has to be illogical, implausible, or with no inferences which can be drawn from the record, that there are no ---- there's no evidence in the record which could allow a reasonable judge to infer the conclusions which I've just read. That's correct. And there is evidence in this case. What BLM relies upon is the Oregon Department of Fish and Wildlife guidance document, which says, okay, there was a sharp decline in the early decades since the 1960s, and then a more gradual decline in the last several years. Whereas Dr. Dobkin points out that more biologically relevant data based on more powerful recent science, specifically the Garton et al. study in the monograph, says that no, those types of anecdotal single-season lek counts that ODFW relies upon are not the best science. And the administratively defined unit that ODFW uses to make its statements has no biological relevance to the sage-grouse in this area, in Louse Canyon. So what you're saying is the judge acted abusing his discretion in accepting the Oregon report rather than Dr. Dodson. That is correct, Your Honor. That's our position. And the second part, my second part of my answer to your original question, Judge Bea, is that population viability is only one part of the analysis, whether we're talking about equities under vacatur, whether we're talking about likely irreparable harm. Another very important part is West Nile virus. And again, the record is even stronger on West Nile virus. Dr. Dodkin says there's a clear and inescapable risk of exposure if these cows are released at these times and places. And the record shows that when exposed to West Nile virus, sage-grouse exhibit 100 percent mortality. That easily surpasses the threshold of showing likely irreparable harm. And if you take it back into the vacatur standard, there's no way that BLM could show that grazing could somehow be protective of the environment when sage-grouse are 100 percent susceptible to dying when exposed to West Nile virus. I would like to reserve the remainder of my time for rebuttal. You may. Thank you. May it please the Court. Good morning. John Smeltzer for the Bureau of Land Management. Your Honors, there are two sets of issues in this case that have been or were discussed by opposing counsel. The one set of issues goes to the legal standard that applies or should have applied to the district court's decision on injunctive relief. The other goes to the issues of the court's factual findings with respect to the likelihood of irreparable harm. I'd like to address both issues in order, starting with the questions regarding the legal standard. And starting there, Your Honors, in Monsanto and in Northern Cheyenne, this Court in the Supreme Court made it absolutely clear that when a plaintiff seeks an injunction to remedy a NEPA violation, that the traditional test for injunctive relief applies, which includes the obligation to prove by the plaintiff's irreparable harm in the interim when new NEPA analysis will be performed. That is the standard that applies here. The plaintiffs have suggested a different standard relating to the cases involving vacatur and the notion of when it's appropriate to remand without vacatur. But those cases have absolutely no bearing here where the district court set aside in full the challenge agency action, which was the 2010 grazing decision. There's no question the Court set that aside. What the plaintiffs are seeking is something in addition to that, and that is an injunction that would halt all grazing under a preexisting permit. Under a what? A preexisting permit, Your Honor. Well, what about Mr. Lacey's point that there is no preexisting permit? Well, he would like to read, Your Honor, the judgment that was issued in this case as having vacated. He goes beyond that. I thought he said, you know, in the proceedings on his motion for injunction pending appeal, he said he uncovered actual 210 permits that were issued, right? Is that true? Right. And so those 210 permits had the effect of canceling the 2006 permits. So there aren't any 2006 permits. Do you agree with that? No, I don't agree with that. He's misreading the record or what? Well, there were 2010 permits. He said there were. There were. There were permits. What was challenged was the 2010 grazing decision, which was a decision to issue permits. There were permits issued after to give effect to that 2010 decision. What we concede is that the decision and the permits were vacated and set aside by the Court's judgment. Then the issue is, well the issue, first issue then, if permits were issued in 2010, didn't they automatically succeed the 2006 permits? Right. So once the 2010 permits are vacated, then there are no permits at all, are there, grazing permits? Extant now. Do you agree with that? We don't agree with that proposition, Your Honor, because the standard rule is when a court sets aside agency action and therefore the presumption is that action never happened, you just fall back on the circumstance that existed prior to the challenged action. Here the challenged action was a decision to replace a 10-year permit or a set of 10-year permits that started in 2006 and were going to go through 2016. If the district court's judgment said, look, that decision, that 2010 decision, it's being set aside because the proper NEPA wasn't done, so then you just pretend that didn't happen, right? And then you've got your existing, pre-existing 2006 permits. Of course the ---- The plaintiff argues the 2006 permits suffer from the same infirmity and should be set aside together with the 2010 permits. Well, Your Honor, that can't possibly be true, because the infirmity that they raise is an infirmity based on new information with respect to the sage-grouse that came into being and that came into public view in 2010. Four years after these permits were issued, four years after people were grazing under these permits, you know, in 2006, 2007, 2008, 2009, something that happens in 2010, new information that comes to light in 2010 is relevant to whether the agency could reasonably rely on NEPA analysis from that point going forward, but it's not something for which you can claim that the pre-existing 2006 permit is invalid. The plaintiffs cite a case in their reply brief or in one of their motion responses that said the, you know, the status quo is the last uncontested circumstance, right, between the parties. The 2006 permits are not contested in this action. There is no basis for finding that they were invalid. There was a challenge to those permits that was the historical procedure of this case, but that challenge has nothing to do with the sage-grouse, and that challenge actually has to do with the change that the permits were going to implement. Let me see if I understand your position. The agency action in 2010 was to replace and supersede the 2006 permits. Yes. Agency action. That agency action was vacated by the United States district court's order. Yes. Therefore, that agency action, if at any time had replaced 2006 permits, didn't replace them when it was vacated. Right. So they no longer are there to replace the pre-existing permits, but you fall back on the pre-existing permits. So in other words, you're saying the vacation of the 2010 action and the permits in effect revived the 2006 permit, right? Right. What was vacated was the decision to replace. Right. And in this Court's precedent, the Paulson v. Daniels is the case we cited as the standard rule. So aren't you arguing this case now like it's more or less like a remand case?  The question that's before this Court right now is whether the district court abuses discretion in declining to grant an additional injunction above and beyond the remand order. I mean, the district court set aside the decision that would have allowed new projects to be built and a new grazing schedule to be undertaken. And that's critical. Another critical piece in understanding the context of this case, Your Honors, is to be challenged in the way it fits in with the original 2005 grazing decision, which set up the 2006 permits and the environmental analysis. This began as a decision to change grazing management through the authorization of projects, fences and water pipelines and other things that would allow cattle to graze in upland areas where, without those projects, the cattle aren't necessarily going to be. And so the challenge was, look, before you can do that, before you can allow cattle dispersed in this new way and allow these new projects, is you have to do this NEPA and you have to look at the impacts on the sage grass. What the district court set aside was that decision to allow those projects. Those projects aren't going forward, the water projects, the fencing, other than what was already built. So that has been enjoined. The action that the agency was taking, what's been allowed to remain in place, was the interim grazing strategy, which is authorized under the 2006 permits. In 2005 grazing decisions, what the agency said was, look, you can continue to graze pursuant to the interim grazing strategy, and then when you build these additional projects, you can shift to a different grazing schedule. And it was really the challenge to the grazing projects that's the same in the 2005 and the 2010 decisions, and that part has been enjoined. The part that we're asking this court to recognize and the district court did recognize continues in validity is the part of the 2005 grazing decisions that simply authorize continued grazing pursuant to the interim grazing strategy. And one additional point with respect to the legal test and what was set aside, plaintiff's counsel suggested that the environmental assessment was set aside. They had asked for the environmental assessment to be set aside. It was not set aside in the district court's judgment. And, again, with respect to the 2006 permits and the validity of those permits, there's no challenge to the environmental assessment that was done in 2005 with respect to the current challenge didn't come out until 2010. So the EA was valid with respect to the 2006 permits. That's the state of the record. There's no reason to presume any invalidity with respect to the permits. So unless there are any other questions with respect to the legal effect and the standard, I'd like to address some of the factual issues that were raised with respect to irreparable harm. Now, what counsel did was presume that the standard in California communities against toxics applies to the district court's exercise of equitable discretion. But, again, what we submit as the proper standard is the irreparable harm standard, and that's the standard that the district court applied. If somehow all the discussion we've just had about the correct standard were wrong, presumably there would have to be a remand for the district court to apply the standards in the California communities against a toxics case. Kennedy. I read a portion of the judge's determination, and it was criticized by Mr. Lacey. Could I have your view on that? If you remind me, Judge Bea, of which particular? Where he supports the proposition. He says the evidence before me certainly strongly supports the proposition that there has been no material decline in the sage-grouse population in any relevant area during the relevant grazing period. Yes, Your Honor. Mr. Lacey says that's clear error. It's not clear error, Your Honor. As far as the record, as I understand it, there's two sets of population data. There's population data from the state of Oregon, which focuses on like counts within Oregon, and there's also population data that was the Garton population data that was referenced that was referred to by Onda's expert, Mr. Dobkin. Both sets of data show relative stability in the period of time that we're focusing on here since the interim grazing strategy has been in effect. How do you handle the West Nile virus new evidence? I just wanted to refer, before I get to the West Nile virus, there's a chart at ER 951, which is representative of the Garton data in the northern Great Basin population, and you can see towards the end the population flatlines to relative stability, and that's what is said in the Dobkin's declaration. With respect to West Nile virus, counsel made the statement that there is 100 percent mortality when sage-grouse are exposed to West Nile virus. First of all, that's not correct. That's not what the record says. The record says there's high mortality, but there is some resistance. That's a small point. The major point is that the critical issue is not what is the mortality when they're exposed, but have they shown that continued grazing is going to increase the likelihood of exposure to West Nile virus above and beyond the natural conditions and what would ordinarily take place anyway. And what the district court determined is if you look at what the factors that lead to potential exposure, and the record on that is there's any number of factors that have to combine to make it possible for an outbreak to occur. There are already water developments or existing natural water sources within the Alaskan GMA. There are already mosquitoes within the Alaskan GMA, and so the risk is already there, and the things that have caused the virus to become more prevalent within North America and in farther northern climates are already there. So the question is what additional aspect does the grazing bring to this? The plaintiffs pointed to two things, the water developments, but again, the continuation of the interim grazing strategy isn't a project to put in more water developments. There are already water developments there, and the water developments that are there are designed in a way to have deep troughs and flowing water, so they don't provide an environment for mosquito breeding. There is also the suggestion that while cattle, when they are around these areas, will create hoof prints that provide possible places for additional sources of West Nile virus. And that's a conjectural possibility, Your Honors, but it was their burden to demonstrate that that increase, just the hoof prints, so increased the danger of exposure from West Nile virus in the near term that injunction is needed to avert that irreparable injury. And I suggest if you look at, and there's lots of, the plaintiffs put most of this in themselves, in the excerpts of record, there's lots of information about West Nile virus and the potential impacts, and what that points to is there's a possibility that artificial water developments can help spread the virus by providing mosquito breeding places, but the data, or the record points principally to stock ponds, stock tanks, ponds associated with coal methane development, and other larger surface areas. And there are statements in the record, I don't want to overstate it, that relating to cattle hoof prints, but there's nothing in the record that suggests that cattle grazing is the significant, game changer, a few more cattle hoof prints is going to make a big difference with respect to West Nile virus, and that's what the district court determined on West Nile virus. One other record point I want to make regarding the expert that plaintiffs pointed to, they said that their expert found beyond a doubt that there's going to be irreparable harm and that we didn't respond to that. Well, if you look at ER 402, paragraph 58, that's the statement from their expert, and he says, in my professional judgment, it is a scientific certainty that significant adverse effects on sage-grass population persistence will result from, and here's the key, the proposed management actions, fence construction, spring developments, pipelines, water troughs, and then he goes on and talks about the timing of grazing and the locations that are going to be associated with those developments. The developments have been set aside. We're not doing that right now. BLM is committed to taking a harder look at impacts to sage-grass with respect to the 2000 information that came out from the Fish and Wildlife Service in order to determine are these plans, which were designed to improve range conditions, are these plans still the right plans with respect to potential impacts on sage-grass? And that's what the agency is planning to do, and what was challenged was really this decision to build these projects and allow this change, and that's been set aside. That's been enjoined. And they simply haven't met, the plaintiffs have not met their burden of showing irreparable injury with respect to the ongoing grazing under the interim grazing strategy. Where do things stand now? I think your brief told us that, was it a program EIS was contemplated or underway and was going to be completed, I think, this spring, so where do things stand right now? There's a programmatic EIS that will be done with respect to all of the Oregon resource management plans to study potential alternatives, conservation measures that will help deal with sage-grass conservation with respect to the new information that has come out. The plan is to have that out spring, summer 2013, this year. My understanding is that is still the plan. After the programmatic EIS comes out, the agency is going to then begin the look back at Louse Canyon GMA for a site-specific determination as to whether the plan, the projects that have been approved prior and the prior decisions are still the right decisions for Louse Canyon or whether there need to be changes with respect to certain of the mitigation measures, et cetera, for that area. Is there a timeline for that? For the follow-up? There's no specific timeline imposed in the district court's judgment. The agency's timeline I'm not particularly certain of, but it would be shortly after the commitment was to the Louse Canyon area to begin the reviews of these management actions started in Louse Canyon and so they're committed to finishing up with Louse Canyon and I understand it would be one of the first ones they would get to after the programmatic review is completed. And, of course, they have these projects on hold, Your Honor, that have been partially built, so there's certainly pressure to figure out are we going to continue building these projects to solve the issues that are in Louse Canyon or do we go to a different direction. So there's no reason to believe they're not going to come back to that quickly. In the context, that may be important, because you've defended the 2006 permits because the information that raised serious questions that led to the overturning of the 2010 permits, or 2011, I lost track. 2010, Your Honor. Was information developed later. So the 2006 permit couldn't have considered the 2009 and so forth information, but we now know that. And so there is at least some concern if there's not an immediate enjoining of grazing, when do we know that information is going to be considered in a required hard look given so that proper plans can be made for the future. Right. And that's a good point, Your Honor, but the same thing is true of all existing grazing permits within Oregon or within the range of the sage grass where BLM has public lands that it's managing. There are existing permits that are going to come up for review, and as they come up for review, the new information with respect to the sage grass will be incorporated into any management decisions. But the burden to stop what was ongoing is a burden on the plaintiffs, and they haven't shown irreparable harm with respect to the sage grass, principally because the issues that confront the sage grass and sage grass conservation are long-term issues. You know, 100-year-out projections as to species extirpation. They're wider than the specific geographic area of the Lost Canyon GMA, and they're due to multiple threats, not simply grazing. So what the agency is doing is taking, you know, a programmatic approach to, look, we've got new information, now let's start with a top-down approach, let's figure out what's going to work across the landscapes and what's going to be necessary, and let's begin to implement it. And it's perfectly reasonable, and certainly the plaintiffs hadn't showed their burden that you have to stop all grazing in the Lost Canyon GMA in this case. Now, a purely technical question. What name is appropriate for your client at this point? We're told about a change of name of the first appellee, and now there's a change of position. So who is V. Pat Ryan. Pat Ryan is now. It's V. Ryan now. Yeah. Okay. Thank you. Thank you for the argument. The bottle. Thank you, Your Honor. Let me touch on a few last points and also answer any remaining questions from the panel in the time I have left. First, let me start with the point that grazing cannot happen on the public lands without a proper NEPA review in place first. Unless there's a lawful NEPA review in place, the cows can't go out yet. That's fundamental. That the new information emerged four years after the prior permits were issued is only relevant insofar as, okay, the equities allow that grazing to stand. It happened. Perhaps the equities suggest that no mitigating. Let's change the facts a little bit. You've got permits issued someplace in 2000. We'll change it just to move the facts of this case. Permits were issued in 2004. Properly done based on the information out at the time, NEPA review and so forth. And then five years later, something comes up and there's this report that suggests, uh-oh, that's not the right decision. Does that mean that the permits are automatically invalidated? No. But in this case, ONDA filed a lawsuit and won the district. With regard to the 2010 permits. With regard to the challenged NEPA review for livestock grazing, which happened to be executed via the 2010 permits, which the agency said we're replacing and superseding those old ones because we recognize that there were some problems here. Of course, BLM doesn't concede that they need to do a full-blown EIS. But they concede that, yes, more NEPA work needs to be done. But I don't understand how that invalidates the 2006 permits. If that more NEPA work needs to be done is something based on evidence that developed after the 2006 permits were issued. Well, it doesn't make any sense for the 2006 permits to spring back, nor, for example, for the case I just cited. I mean, I said permits issued in 2004, later development of information. Does that invalidate the 2004 permits? I think the answer turns out to be no, it doesn't by itself. And I'm not sure why it's different here. Well, the information is significant new information, which under NEPA requires that the agency stop and take a new look at it. And whether you're talking about the 2006 permits or the 2010 permits, both were based on the same NEPA analysis that was vacated and set aside by the district judge on to one summary judgment on its single claim for relief under NEPA, which was that the Bureau of Land Management violated NEPA by failing to prepare an EIS. And the district court agreed and granted summary judgment to none disfavor. I see that I'm over time. But you see, there was not that shortcoming in the 2006 permits. In other words, you know, there was no sustained allegation that the 2006 permits are faulty because there was no NEPA review, right? So under NEPA, the 2006 permits are perfectly valid. Well, so why does the fact that the 2010 action is set aside for failure to conform with NEPA affect the 2006 permit? Well, why would ONDA challenge the 2006 permits when the Bureau of Land Management told the public and told the district court judge that those permits are gone, we've replaced them and superseded them? It wouldn't make sense for us to still challenge them. The first argument out of BLM's mouth would be, whoa, that's moot. We've replaced and superseded them. Well, if somebody has a will and then replaces it with a new will, and the new will recites how the first will was gone, but after the person making the will dies, and there's a challenge to the new will, the usual remedy is to go back, if the challenge is successful, to go back to what was standing before. Disregard the cancellation because the act of cancellation was itself part of the thing that's been set aside. I understand the government's argument here to be pretty similar, that what was done in 2010 was set aside as a whole. And that means the cancellation or superseding of the 2006 permits is no longer valid. Well, I'm not a wills and trusts lawyer, Your Honor. I'm not either. But I think that the situation, the hypothetical you pose, is more similar to this Court's remand without vacatur cases where a rulemaking of open-ended duration and broad applicability springs back into place in order to provide a backstop of an environmental protection or, in the case of a will, some protection so that it doesn't go to intestate status, whereas in this case we have a fixed-duration, site-specific permit to conduct ground-disturbing activity on the public land. And I think that's a key distinction under this case, under this Court's NEPA and other environmental case law. And the 2006 permit was a 10-year permit. That is correct. So it still has three years to run if it has sprung back to life. If it sprung back to life, yes. But, see, if it springs back to life, here's one more question now. NEPA applies, right, only when there's Federal action. And a permit springing back to life is not that kind of action, is it? You're asking whether BLM would be required to conduct, to start a new NEPA process in order to spring an old permit back to life? Well, no. What's your argument is that there can't be grazing without NEPA review. There was NEPA review on the 2006. But BLM admitted that the NEPA review was insufficient by withdrawing those decisions and announcing that there were. For the 2010 permit, which included development which was not included in the 2006 permit. True? No. All of the developments were proposed originally in the 2005, 2006 decisions. And then in the 2010 decisions, BLM decided to keep the ones they already built, and then to continue on with most of the other ones that were originally proposed in 2005. Thank you. We thank all counsel for the helpful arguments today. The case just argued is submitted. We're adjourned. All rise.
judges: Tashima, Clifton, Bea